[Civ. No. 24901. Second Dist., Div. One. Dec. 23, 1960.]

AUTO AUCTION, INC. (a Corporation), Appellant, v.
RIDING MOTORS (a Corporation), Respondent.

694

Green & Dewar and Herschel B. Green for Appellant.

Johnson & Johnson for Respondent.

LILLIE, J.—From an adverse judgment in a suit by Auto Auction against Riding Motors to recover $5,000 in damages for breach of warranty of title to an automobile, Auto Auction has appealed.

Most of the background facts are undisputed; they commence in New Orleans on July 6, 1958. On that day, a Sunday, one Harvey called at the show room of O. E. Haring, Inc., a Chrysler dealer in that city, to look at automobiles. A regularly employed Haring salesman, Frank Winling, proceeded to show Harvey a 1958 Chrysler Imperial, registered in the name of O. E. Haring, Inc., possessing a Louisiana certificate of title thereto; in the course of these negotiations, Winling was joined by Harry J. Virgets, Haring's general manager. Subsequently Virgets left for home; later, he telephoned Winling to suggest that Harvey take the car home overnight for his wife's examination and approval; this Harvey decided to do. Before Harvey departed with the car, Winling wrote

up and signed an order for the sale on a Haring form which Harvey signed as purchaser; the price was $5,600, the list price ($7,414.90) being reduced by $1,814.90 on the express authority of Virgets. The order was never signed by Virgets or Haring. Harvey gave Winling $50 in cash; he also executed and delivered to Winling a chattel mortgage on Haring's regular form by which he promised to pay the balance of the agreed purchase price.

Harvey failed to return with the car on Monday; Virgets reported the matter the same day to New Orleans law enforcement agencies and the field office of the Federal Bureau of Investigation. An offer to pay $1,000 for information leading to the recovery of the car was circulated throughout the 48 states—this sum, it appears, was paid when the car was eventually recovered, although it further appears that a criminal complaint against Harvey was never signed by a Haring representative or any other person.

The car was taken by Harvey into Alabama where license plates were purchased (as permitted by law) without proof of ownership; he then took the car to Wyoming where Wyoming plates were purchased and a Wyoming certificate of title (dated July 30, 1958) obtained on the car in the name of Harvey upon presentation of the Alabama plates. On August 9, 1958, Harvey made an appearance at the business office of Barnett Motors in Long Beach, California; he proceeded to sell the car to Barnett for $3,850 cash, delivering a bill of sale and the Wyoming certificate of title and registration. On August 11, 1958, Barnett sold the car to Riding Motors, defendant herein, for $4,000; the next day, Riding sold the car to plaintiff Auto Auction for $4,150 which in turn sold the Chrysler to Tower Motors of San Diego for $4,195. In each case the seller gave the buyer a bill of sale in the usual form containing an express warranty of title with "no exceptions."

Subsequently Tower Motors learned that Haring was claiming that the car had been stolen and was threatening to seize it. Tower Motors demanded that plaintiff make good on its warranty of title and procure good title from Haring. Plaintiff then ascertained that Haring would give it a bill of sale and its Louisiana certificate of title for $5,000; demand was made by plaintiff on defendant for such sum, but the latter refused to comply. Plaintiff then paid Haring $5,000, receiving a bill of sale and certificate of title. The present suit was thereupon instituted for breach of warranty and for the recovery of the money paid to Haring.

The major problem is one in the field of conflict of laws, namely, whether there was a "sale" of the car to Harvey under the law of Louisiana in which state the car was located and where Haring did business; this point seems to be conceded. ■ Title to a tangible movable or chattel passes according to the law of the place where the chattel was at the time of the transaction by which it is claimed the title was passed. (Beale, Conflict of Laws, § 255.5, p. 981.) Says the Restatement, Conflict of Laws, section 260: "An interest in a chattel acquired in accordance with the law of the state in which the chattel is at the time when the interest is acquired will be recognized in a state into which the chattel is subsequently taken"; to the same general effect is the discussion found in 11 California Jurisprudence 2d, Conflict of Laws, section 48, pages 127 et seq.

■ Appellant challenges the sufficiency of the evidence to support the following finding by the trial court: "On or about July 6, 1958, at New Orleans, Louisiana, O. E. Haring, Inc. sold to one Ellsworth Harvey a 1958 Chrysler Crown Imperial four-door sedan . . . for the sum of $5,600, receiving from said Ellsworth Harvey, $50 in cash and his promise to pay the balance, evidenced by a chattel mortgage covering said automobile." Singled out are excerpts from the testimony of Winling, a witness for respondent, who stated that Harvey "was to bring back the car the next morning or bring the money for the car"; also, "I asked him for a deposit on the automobile . . . he told me he didn't have much money . . . I said 'What do you have?' . . . and he had $50 which he gave me as a deposit on the pending deal." Appellant emphasizes the above statement that this was only a *"pending deal"*; however, there is contrary testimony reasonably susceptible of the inference that there was a sale of the automobile to Harvey. Winling testified that he had authority to sell automobiles and close deals for Haring; on cross-examination Haring testified to the same effect. The sales manager, Virgets, stated that he (Virgets) had authority to approve sales and deliveries of automobiles and that Winling was authorized to close deals but not to deliver without an authorization from an officer of the company; in this connection, however, it is rather interesting that Virgets, at the time of the Harvey transaction, himself considered that there had been a sale. He testified: "Winling finally took him (Harvey) over and closed the deal" and "Winling *consummated* selling him (Harvey) the automobile in the back." Too, Winling's under-

standing was that there had been a sale subject to rescission; he stated: "I got Mr. Harvey to sign an order for the automobile, also with the understanding that if the deal wasn't satisfactory we would take the automobile back, and he wouldn't have to buy the automobile." What appellant seems to be contending for here is that the "sale" was dependent on "delivery," and there is evidence that Winling had no authority to "deliver" the car; but he was given that authority by Virgets, and there was also ostensible authority to do so under the circumstances of the instant case as well as in the light of the customs and usages of the particular trade of which we may take judicial notice (*Correa* v. *Quality Motor Co.*, 118 Cal.App.2d 246, 251 [257 P.2d 738]); the case just cited also restates the settled rule that the extent of an agent's authority is a question of fact (p. 251).

Additional evidence that the transaction constituted a "sale" is found in the execution of a chattel mortgage by Harvey and the delivery thereof to Winling as confirmatory of the former's promise to pay the balance due on the car. Appellant vigorously attacks the court's finding that such an instrument was in fact executed—the instrument was never recorded. The only testimony, pro and con, came from Winling and Haring respectively. Winling was positive and unequivocal as to the facts involved; Haring's testimony was to the effect that he knew nothing of the chattel mortgage, but he concededly was not present when the transaction took place and his testimony must be weighed in that light. Notwithstanding appellant's very able critique respecting the implausibility of Winling's account of the pertinent events, the trial court believed Winling.

Under Louisiana law, it appears that the failure of Harvey to obtain from Haring a certificate of title did not prevent him from acquiring title to the automobile and thus perfecting a sale of the vehicle. Both sides have cited recent Louisiana decisions said to support their respective positions; however, an excerpt from *Lemaire* v. *Pellerin* (1958), 102 So.2d 493, relied on by appellant, appears to sustain the point contended for by respondent: "It is well settled that the provisions of the Certificate of Title law that the buyer of a vehicle shall acquire no marketable title from the owner does not repeal the provisions of the LSA-Civil Code, art. 2439, to the effect that the sale is perfected as soon as there exists an agreement of the property and the price thereof, although the property has not yet been delivered nor price paid. Failure to obtain the

certificate of title does not make the sale of a motor vehicle void but simply causes the title to be imperfect until the certificate is acquired." (P. 498.) Respondent's case, *Flatte* v. *Nichols* (1957), 233 La. 171 [96 So.2d 477] is closer on its facts. Flatte, a Texas dealer, sold a Cadillac convertible to one Pat Murphy, a Mississippi dealer; the invoice stated that the automobile was sold for cash—Murphy giving Flatte a check for the purchase price. The car was licensed by Murphy in Mississippi and sold to the defendant, a Louisiana dealer, who resold it. Murphy's check was never honored. Flatte sued defendant for the return of the car or its value, maintaining that title did not pass since defendant (a Louisiana dealer) never obtained a certificate of title as required by the law of that state. Said the court (p. 479 [96 So.2d]); "It is clear from the decision of this court in *Jeffrey Motor Company* v. *Higgins*, 230 La. 857 [89 So.2d 369] that this was a credit sale and title passed. The court therein pointed out that under Article 2456 of the LSA-Civil Code the sale was complete when Jeffrey accepted the draft, which was given in that case, as there then existed an agreement for the object and for the price thereof." In the case at bar, of course, it is not argued that there was any dispute over the actual car to be sold or the purchase price thereof. The reasoning of the Flatte decision is applicable and dispositive of the matter.

▮ Even if there was no rule of comity, the facts here would call for the application of the principle that where one of two innocent persons must suffer a loss because of the acts of a third person, the one by whose negligence it has been occasioned must bear it (7 Cal.Jur.2d, Automobiles, § 432, p. 370); but, says appellant, estoppel was not pleaded in respondent's answer and it cannot be claimed that it was relying on any alleged conduct of Haring as constituting an estoppel.

▮ While it is a well-settled rule of pleading that estoppel is an affirmative defense which must be affirmatively averred (*Edgington* v. *Security-First National Bank*, 78 Cal.App.2d 849, 857 [179 P.2d 640]), an estoppel does not necessarily have to be pleaded where the party in whose favor it exists at the time of preparing his pleading is without knowledge that his claim must ultimately rest on it. (*First National Finance Corp.* v. *Five-O Drilling Co.*, 209 Cal. 569, 576 [289 P. 844].) In *Beckjord* v. *Traeger*, 3 Cal.App.2d 385, 387 [39 P.2d 523, 41 P.2d 172], it is said: "It may be admitted that estoppel must ordinarily be pleaded but an inspection of the transcript reveals the fact that estoppel was discussed in the opening

discussion of the case and in the testimony that followed and was in effect carried into the findings. In such circumstances it became an issue of the case as effectively as though it had been pleaded.'' In the present case, the transcript discloses the following from the opening statement by respondent's counsel: ''Ridings takes the position that either title passed down in New Orleans or that the owner down there is estopped by his conduct to assert his title.'' Too, estoppel became the subject matter of some or all of the several depositions taken following the filing of the complaint, and the cause was tried on that theory, among others.

Remaining points made by appellant save one, are covered by what has hereinabove been set forth. Appellant argues that it was required to pay $5,000 to Haring in order to acquire title and prevent repossession of the automobile; the trial court expressly found that it was not necessary for appellant to do so. Before an action may be maintained for breach of warranty of title, there must be an actual loss to the buyer rather than a mere contingency of loss. (77 C.J.S., Sales, § 335b, p. 1222.) When Haring made its demand on appellant for $5,000, the former had only a claim of title; since the chattel mortgage was never recorded, subsequent purchasers for value had no knowledge thereof and Haring had no liens capable of enforcement. It seems that in complying with Haring's demand, appellant acted as a mere volunteer and should not expect reimbursement—at least from respondent.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.